**23-11741**

# United States Court of Appeals
### *for the*
# Eleventh Circuit

L.E., by and through their parent and next friend, SARA CAVORLEY, B.B.,
a minor, by and through their parent and next friend, ELIZABETH BAIRD, A.Z.,
a minor, by and through their parent and next friend, JESSICA ZEIGLER, C.S.,
a minor, by and through their parent and next friend, TARASHA SHIRLEY,

*Plaintiffs/Appellants,*

– v. –

SUPERINTENDENT OF COBB COUNTY SCHOOL DISTRICT,
RANDY SCAMIHORN, in his official capacity as a member of the Cobb County Board
of Education, DAVID BANKS, in his official capacity as member of the Cobb County
School Board, DAVID CHASTAIN, in his official capacity as member of the Cobb
County School Board, BRAD WHEELER, in his official capacity as member of the
Cobb County School Board, *et al.*,

*Defendants/Appellees.*

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA CASE NO: 1:21-cv-04076-TCB

## BRIEF OF APPELLEES

BRANDON O. MOULARD
SHERRY H. CULVES
JEFFREY R. DANIEL
PARKER POE ADAMS & BERNSTEIN LLP
1075 Peachtree Street, NE Suite 1500
Atlanta, Georgia 30309
(678) 690-5750
brandonmoulard@parkerpoe.com
sherryculves@parkerpoe.com
jeffdaniel@parkerpoe.com

*Counsel for Appellees*

CP COUNSEL PRESS    (800) 4-APPEAL • (JOB 809713)

L.E., et al. v. Superintendent of Cobb County School District, et al.

Case No. 23-11741-J

## APPELLEES' CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Under Federal Appellate Rule 26.1 and Eleventh Circuit Rule 26.1, Defendants-Appellees list the trial judge(s) and all attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of this case or appeal, including subsidiaries, conglomerates, affiliates, and parent corporations, including any publicly held corporation that owns 10% or more of the party's stock, and other identifiable legal entities related to a party:

A.Z.: Plaintiff/Appellant (minor)

Baird, Elizabeth: Parent of B.B.

Banks, David: Defendant/Appellee

Batten, Hon. Timothy: Trial Judge

B.B.: Plaintiff/Appellant (minor)

Boone, Brock: Counsel for Plaintiffs/Appellants

Cavorley, Sara: Parent of L.E.

Choi, Eugene: Counsel for Plaintiffs/Appellants

Cobb County School District: Defendant/Appellee

C.S.: Plaintiff/Appellant (minor)

Culves, Sherry: Counsel for Defendants/Appellees

Daniel, Jeffrey: Counsel for Defendants/Appellees

C-1

L.E., et al. v. Superintendent of Cobb County School District, et al.
Case No. 23-11741-J

Davis, Charisse: Defendant/Appellee

Goodmark, Craig: Counsel for Plaintiffs/Appellants

Goodmark Law Firm: Law Firm for Plaintiffs/Appellants

Howard, Jaha: Defendant/Appellee

Hutchins, Leroy Tre: Defendant/Appellee

Law Office of Allison B. Vrolijk: Law Firm for Plaintiffs/Appellants

L.E.: Plaintiff/Appellant (minor)

Nelson Mullins Riley & Scarborough LLP: Former Law Firm for Defendants/Appellees

Parker Poe Adams & Bernstein LLP: Law Firm for Defendants/Appellees

Ragsdale, Chris: Defendant/Appellee

Scamihorn, Randy: Defendant/Appellee

Sherburne, Claire: Counsel for Plaintiffs/Appellants

Shirley, Tarasha: Parent of C.S.

Southern Poverty Law Center: Law Firm for Plaintiffs/Appellants

Tafelski, Michael: Counsel for Plaintiffs/Appellants

Vrolijk, Allison: Counsel for Plaintiffs/Appellants

Wheeler, Brad: Defendant/Appellee

Zeigler, Jessica: Parent of A.Z.

L.E., et al. v. Superintendent of Cobb County School District, et al.
Case No. 23-11741-J

No publicly traded company or corporation has an interest in the outcome of this appeal.

Respectfully submitted this the 1st day of December, 2023.

/s/ *Brandon O. Moulard*
Brandon O. Moulard

## <u>STATEMENT ON ORAL ARGUMENT</u>

The Appellants requested oral argument. The Appellees disagree that oral argument is necessary or would be useful. The parties have thoroughly presented the facts and legal arguments in their briefs. And this case presents no novel issues on appeal. For those reasons, oral argument is unlikely to aid the Court in the decisional process. *See* Fed. R. App. P. 34(a)(2)(B)-(C).

## TABLE OF CONTENTS

**Page**

APPELLEES' CERTIFICATE OF INTERESTED PERSONS AND
CORPORATE DISCLOSURE STATEMENT ....................................................C-1

STATEMENT ON ORAL ARGUMENT ...................................................................i

TABLE OF AUTHORITIES ..................................................................................iv

STATEMENT OF THE ISSUES................................................................................1

INTRODUCTION ....................................................................................................2

STATEMENT OF THE CASE...................................................................................4

    I.    Proceedings and disposition of the district court ..................................4

    II.    Statement of Facts. ................................................................................7

        A.    COVID-19 in Cobb County in March 2023 ...............................7

            1.    COVID transmission in Cobb County was low and
                trending lower ..................................................................7

            2.    The dominant variant was less dangerous than
                previous variants ............................................................8

            3.    Research challenges the effectiveness of mask
                mandates...........................................................................10

            4.    Governments have lifted their states of emergency..........12

            5.    Georgia law now prohibits mask mandates
                 in schools.........................................................................13

        B.    CCSD's efforts to fight COVID in schools ..............................13

            1.    CCSD complies with current CDC and DPH
                guidelines for COVID-19 in schools .................................13

            2.    CCSD offered robust, effective virtual-learning
                options.............................................................................15

            3.    CCSD's stance on compulsory masking............................16

        C.    Status of the Students.................................................................16

1. C.S. and A.Z. have withdrawn from CCSD ..................16

2. After returning to face-to-face learning, L.E. chose home-based instruction for non-COVID-related reasons ................................................17

3. B.B. returned to face-to-face learning ...........................18

4. The Students have been vaccinated ................................20

STANDARD OF REVIEW ..............................................................20

SUMMARY OF THE ARGUMENT ...................................................21

ARGUMENT AND CITATION OF AUTHORITY ...............................22

I. C.S. and A.Z. lack standing to seek injunctive relief.........................22

A. Standing to seek an injunction requires a concrete threat of imminent injury .......................................................22

B. After withdrawing from CCSD, A.Z. and C.S. face no imminent threat of future injury................................24

C. The outdated allegations in the Students' Complaint do not create standing to seek a preliminary injunction ...............27

II. The Students' fear of contracting severe illness is not an injury-in-fact for standing purposes ...............................................30

III. The Students cannot show a substantial likelihood of prevailing on their failure-to-accommodate claims ...........................34

A. The need for a proposed accommodation depends heavily on the effectiveness of accommodations already in place ...............................................................36

B. The Students' failure to prove the need for compulsory masking rendered the reasonableness of that request irrelevant .................................................................40

C. The Students' absences do not prove that CCSD's current accommodations are ineffective ...................................42

CONCLUSION ...........................................................................43

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*A.L. by and through D.L. v.Walt Disney Parks and Resorts U.S., Inc.*,
    900 F.3d 1270 (11th Cir. 2018) .........................................................35, 36, 37

*A.L. by and through Walt Disney Parks and Resorts U.S., Inc.*,
    50 F.4th 1097 (11th Cir. 2022) ................................................................37, 38

*Al Najjar v. Ashcroft,*
    273 F.3d 1330 (11th Cir. 2001) .......................................................................30

*Am. C.L. Union of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*,
    557 F.3d 1177 (11th Cir. 2009) ........................................................21, 23, 27

*BellSouth Telecomms., Inc. v.*
    *MCIMetro Access Transmission Servs., LLC*,
    425 F.3d 964 (11th Cir. 2005) .........................................................................21

*Bircoll v. Miami-Dade Cnty.*,
    480 F.3d 1072 (11th Cir. 2007) .......................................................................34

*Bryant v. Rich*,
    530 F.3d 1368 (11th Cir. 2008) .......................................................................21

*Cacchillo v. Insmed, Inc.,*
    638 F.3d 401 (2d Cir. 2011) ...........................................................................28

*Church of Scientology Flag Serv. Org., Inc. v. City of Clearwater*,
    777 F.2d 598 (11th Cir. 1985) .......................................................................29

*Church v. City of Huntsville*,
    30 F.3d 1332 (11th Cir. 1994) .......................................................................29

*City of Los Angeles v. Lyons*,
    461 U.S. 95 (1983).................................................................................... 27-28

*City of Miami Gardens v. Wells Fargo & Co.*,
    956 F.3d 1319 (11th Cir. 2020) .......................................................................28

*Clapper v. Amnesty Intern. USA*,
    568 U.S. 398 (2013)....................................................................31, 32, 33, 34

*Cone Corp. v. Fla. Dep't of Transp.*,
    921 F.2d 1190 (11th Cir. 1991) ....................................................29

*DaimlerChrysler Corp. v. Cuno*,
    547 U.S. 332 (2006)......................................................................23

*Davis v. Fed. Election Comm'n*,
    554 U.S. 724 (2008)......................................................................23

*Democratic Exec. Comm. of Fla. v. Lee*,
    915 F.3d 1312 (11th Cir. 2019) .............................................20, 21

*Dream Defs. v. Governor of the State of Fla.*,
    57 F.4th 879 (11th Cir. 2023) ......................................................21

*E.T. v. Paxton*,
    41 F.4th 709 (5th Cir. 2022) ..................................................32, 33

*Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n
    on Election Integrity*,
    878 F.3d 371 (D.C. Cir. 2017)......................................................28

*Fla. St. Conf. of N.A.A.C.P. v. Browning*,
    522 F.3d 1153 (11th Cir. 2008) ...................................................31

*Fuller ex rel. Fuller v. Decatur Pub. Sch. Bd. of Educ. Sch. Dist. 61*,
    251 F.3d 662 (7th Cir. 2001) .......................................................25

*Harris v. Universityof Massachusetts Lowell*,
    43 F.4th 187 (1st Cir. 2022) .........................................................25

*Holly v. Clairson Indus., L.L.C.*,
    492 F.3d 1247 (11th Cir. 2007) ...................................................35

*Kentucky v. Graham*,
    473 U.S. 159 (1985).......................................................................2

*Kocsis v. Florida State University Board of Trustees*,
    788 F. App'x 680 (11th Cir. 2019)..........................................25, 26

*L.E. v. Superintendent of Cobb Cnty. Sch. Dist.*,
    55 F.4th 1296 (11th Cir. 2022) ..................................................5, 6

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992)...........................................23, 28, 29, 31, 41

*Lujan v. Nat'l Wildlife Fed'n (Lujan I)*,
    497 U.S. 871 (1990)......................................................................28

*Mumid v. Abraham Lincoln High School*,
    618 F.3d 789 (8th Cir. 2010) ................................................. 25-26

*Nadler v. Harvey*,
    No. 06-12692, 2007 WL 2404705 (11th Cir. Aug. 24, 2007)......................38

*Olmstead v. L.C. ex rel. Zimring*,
    527 U.S. 581 (1999)................................................................5, 6, 7

*R.K. by & through J. K. v. Lee*,
    53 F.4th 995 (6th Cir. 2022), *reh'g denied,* No. 22-5004,
    2022 WL 18434486 (6th Cir. Dec. 28, 2022)...............................33

*Scarfo v. Ginsberg*,
    175 F.3d 957 (11th Cir. 1999) ......................................................31

*Schaw v. Habitat for Hum.. of Citrus Cnty., Inc.*,
    938 F.3d 1259 (11th Cir. 2019) ...................................35, 36, 40, 41

*Schwarz v. City of Treasure Island*,
    544 F.3d 1201 (11th Cir. 2008) ....................................................35

*Smith v. Comm'r, Ala. Dep't of Corr.*,
    No. 21-13581, 2021 WL 4916001 (11th Cir. Oct. 21, 2021)......................42

*Stewart v. Happy Herman's Cheshire Bridge, Inc.*,
    117 F.3d 1278 (11th Cir. 1997) ...............................................35, 38

*TransUnion LLC v. Ramirez*,
    141 S. Ct. 2190 (2021)...................................................22, 23, 30

*Warth v. Seldin*,
    422 U.S. 490 (1975)....................................................................22

*Williams v. Board of Regents of University System of Georgia*,
    477 F.3d 1282 (11th Cir. 2007) ...................................24, 25, 26, 27

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)........................................................................20

*Wooden v. Bd. of Regents of Univ. Sys. of Ga.*,
    247 F.3d 1262 (11th Cir. 2001) ....................................................23

**Statutes and Other Authorities:**

29 U.S.C. § 794 ...............................................................................4

42 U.S.C. § 12132 .............................................................................4

U.S. Const., art. III, § 2, cl. 1 .........................................................22

Americans with Disabilities Act, Title II ....................................1, 4

Fed. R. Civ. P. 65 ...........................................................................28

Ga. Comp. R. & Regs. 160-4-2-.31 ...............................................18

O.C.G.A. § 20-2-59..........................................................................13

O.C.G.A. § 20-2-779.2......................................................................13

O.C.G.A. § 20-2-2077.......................................................................13

O.C.G.A. § 20-2-2094.......................................................................13

Rehabilitation Act § 504 .............................................................1, 4

Ambarish Chandra, Ph.D., Tracy Hoeg, Ph.D., *Lack of correlation
    between school mask mandates and pediatric COVID-19 cases
    in a large cohort*,  The Journal of Infection Vol. 85 .....................11

ASSOCIATED PRESS, *Biden ends COVID national emergency
    after Congress acts* ........................................................................12

CDC, Operational Guidance for K-12 Schools and Early Care and
    Education Programs to Support Safe In-Person Learning.......................13, 14

CENTERS FOR DISEASE CONTROL AND PREVENTION, *5 Things You Should
    Know about COVID-19 Vaccines*..................................................20

Cobb County Government, Communications, *Chairwoman Cupid ends
    COVID Declaration of Emergency early* ......................................13

Ga. Dept. of Ed., Hospital/Homebound Services Program Overview ...................18

Gov. Brian Kemp Office of the Governor, *Gov. Kemp Issues Final Public
    Health State of Emergency Order* ................................................12

Isobel Ward, *et al.*, *Risk of covid-19 related deaths for SARS-CoV-2 omicron (B.1.1.529) compared with delta (B.1.617.2):retrospective cohort study*, BMJ Clinical Research ed., Vol. 378 ................................... 8-9

Lindsey Wang, *et al.*, *Comparison of outcomes from COVID infection in pediatric and adult patients before and after the emergence of Omicron*, Preprint Server for Health Sciences., Vol. 37 ...............................9

Tom Jefferson, *et al*., *Physical interventions to interrupt the spread of respiratory viruses*, Cochrane Database of Systematic Reviews 2023, Issue 1 ...........................................................................................10, 11

## STATEMENT OF THE ISSUES

1)    Did the district court err when it found that Appellants C.S. and A.Z. gave up standing to enjoin the Cobb County School District's policies when they withdrew from the Cobb County School District, enrolled in new schools, and presented testimony showing they have no present intention of returning?

2)    Do the Appellants have standing to seek injunctive relief based solely on their perceived risk of suffering severe, COVID-related health complications unless their schools adopt mask mandates?

3)    Did the district court err in finding that the Appellants are unlikely to prevail on the merits of their claims for failure to accommodate under Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act?

## **INTRODUCTION**

The Appellant are four parents who sue[1] on behalf of their minor children: L.E., B.B., A.Z., and C.S. ("Students"). The Students originally brought this case over two years ago, hoping then to compel the Cobb County School District ("CCSD") to adopt universal masking and other COVID-19 measures recommended at the time by the Centers for Disease Control and Prevention. Much has changed since then. A.Z. and C.S. withdrew from CCSD and have no plan to go back. B.B. and L.E. returned to in-person instruction in the fall of 2022 along with the bulk of CCSD's student body. The CDC no longer recommends universal masking and has rolled back most of its older guidelines for COVID-19 in schools. Vaccinations and other therapies have blunted COVID-19 case rates in Cobb County and nationwide. And the state and national states of emergency have been rescinded. Despite all that, the Students still claim they risk irreparable harm without a preliminary injunction empowering them to force other students and staff in their schools to wear masks.

---

[1] Along with the Cobb County School District, the Students have sued Superintendent Chris Ragsdale and all members of the Cobb County Board of Education in their official capacities. Claims against government officials in their official capacities are in reality claims against the government entity they serve. *Kentucky v. Graham*, 473 U.S. 159, 165 (1985).

The district court rightfully denied the Students' motion for preliminary injunctive relief. This Court should affirm that ruling because the Students' motion suffers from two key shortcomings.

First, the Students have no standing to seek a preliminary injunction. More than a year ago, C.S. and A.Z. left CCSD and enrolled in private school. Testimony from their parents confirms they have no intent to return to CCSD. As a result, they face no risk of future injury because of CCSD's masking policies and would not benefit from an injunction. In addition, the Students' fear of either contracting COVID in school or suffering COVID-related complications is too conjectural to establish constitutional standing to seek injunctive relief.

Second, the Students cannot show a substantial likelihood of prevailing on their failure-to-accommodate claims. Even if their demand for compulsory masking were reasonable, their accommodation claim still fails because they cannot show that their preferred accommodation is *necessary* to give them an equal opportunity to access in-person education along with their non-disabled peers. They already have meaningful access to in-person education. Even without compulsory masking, CCSD's COVID-mitigation measures have been highly effective in reducing the risk of COVID transmission in schools. The Students lack empirical evidence that compulsory masking would reduce that risk further.

Beyond that, COVID simply does not present the same level of risk it once did. More than two years into this litigation, COVID cases (including those resulting in severe complications, hospitalization, or death) have plummeted. The prevailing strains of the virus are far milder than the Delta variant people once feared. The Students all have been vaccinated, capping any risk of health complications if they catch COVID. L.E. and B.B. have made good grades and safely attended school in-person. And if they have missed in-person school, it was not because of COVID or the mask-optional policy they continue to challenge. In short, the world is not the same place it was when the Students filed suit.

Setting aside the Students' risk-aversion, the evidence shows that the virus presents no greater impediment to accessing in-person education than for their non-disabled peers. The Students show no error in how the district court weighed that evidence.

## STATEMENT OF THE CASE

### I.    Proceedings and disposition of the district court.

The Students originally brought claims for declaratory and injunctive relief against CCSD, its superintendent, and all school board members in their official capacities (collectively, "CCSD"), alleging that they violated their rights under Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132, and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, when it implemented a mask-

optional policy for the 2021-2022 school year [*Id*. ¶¶ 1, 30, 38.] The Students asked the district court to force CCSD to implement a district-wide mask mandate based on now-obsolete CDC guidelines. [*Id.* ¶¶ 45-46.]

The Students also moved for a temporary restraining order or preliminary injunction, arguing that, without a mask mandate, they could not attend school and would suffer irreparable harm. [Doc. 2.] After considering the parties' briefs and holding a hearing, the district court denied the Students' motion, finding they had not established a substantial likelihood of prevailing on the merits of their disability-discrimination claims. [Doc. 54 at 5.]

The Students appealed that ruling [Doc. 55], and this Court reversed. This Court held that the district court erred by not considering whether virtual schooling was a reasonable accommodation for an "in-person education," as opposed to "education," in general. *L.E. v. Superintendent of Cobb Cnty. Sch. Dist.*, 55 F.4th 1296, 1302–1303 (11th Cir. 2022). This Court also found that the district court erred by not addressing the Students' unjustified-isolation claim under *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999). *Id.* at 1303-1304. Finally, this Court held that because the Students sought full compliance with the CDC's guidelines related to COVID-19 in schools, their claims were not moot under Article III just because the CDC guidelines no longer required universal masking. *Id.* at 1301. This Court remanded "for analysis under the

correct scope: access to the benefits provided by in-person schooling." *Id.* at 1304.

On remand, the district court held a status conference to set a briefing schedule for the Students to file an amended motion for preliminary injunction. [Doc. 73.] On March 3, 2023, the Students filed their Amended Motion for Temporary Restraining Order and Preliminary Injunction. [Doc. 74.] In their amended motion, rather than seek mandatory masking, the Students shifted course and sought an injunction permitting their schools to consider localized mask mandates as a reasonable accommodation. [*See id.*] CCSD opposed the amended motion. [Doc. 75.]

The district court denied the Students' amended motion. [Doc. 82.] It held that A.Z. and C.S. "lack standing in this case" because they no longer attend CCSD. [*Id.* at 8.] On that basis, the court dismissed A.Z. and C.S. altogether. [*Id.*] As for L.E. and B.B., the court found they were unlikely to succeed on the merits of their failure-to-accommodate or *Olmstead* claims. [*Id.* at 10.] The court explained that CCSD had "conducted individualized inquiries and have provided Plaintiffs with a host of accommodations in an effort to provide them meaningful access to an in-person education." [*Id.* at 12-13.] Those accommodations, the court concluded, have been effective, as reflected by

"L.E.'s and B.B.'s attendance records and academic performance. [*Id.* at 14-15.] As for the *Olmstead* claims, the court found that the Students "presented no evidence they have been involuntarily removed from their classes or otherwise involuntarily segregated from their peers." [*Id.* at 19.]

About a week later, the Students moved the district court to clarify whether it dismissed A.Z. and C.S. from the case entirely or just for purposes of the amended motion for preliminary injunction. [Doc. 85 at 4.] The district court responded to the Students' motion for clarification by confirming that because "A.Z. and C.S. lacked standing to pursue the relief they sought," the court "dropped them as parties to this case." [Doc. 87 at 2.] After receiving that ruling, the Students brought this appeal. [Doc. 88.]

## II.  <u>Statement of Facts.</u>

When the district court denied the Students' amended motion for preliminary injunction, the record reflected the facts set forth below.

### A. COVID-19 in Cobb County in March 2023.

#### 1.  COVID transmission in Cobb County was low and trending lower.

When the district court considered the Students' amended motion, the current Georgia Department of Public Health-endorsed ("GDPH") data showed that the daily average of new COVID cases was only 20 per 100,000 residents in Cobb County, with an average of 0.1 deaths per 100,000 resident in Cobb.

Summary of Covid-19 in Cobb County Georgia, Emory University, https://covid19.emory.edu/13/067) (last visited March 13, 2023). Between February 20, 2023 and March 5, 2023, Cobb County reported 43 total COVID-19 cases for children age 5 to 17 years old. [Doc. 75-2 ¶ 38.] That data translated to a 14-day case rate of 64 cases per 100,000 Cobb County residents, reflecting an overall decrease in infections. [*Id.*] The GDPH also reported that the 7-day average number of county-wide infections was 6.14 for 5 to 9-year-olds and 13.57 for 10 to 17-year-olds. [*Id.* ¶ 39.] The 7-day average was the moving average of the confirmed case counts over the previous 7 days. [*Id.*]

### 2. The dominant variant was less dangerous than previous variants.

When this case began, the Delta variant was the dominant COVID strain. In the fall of 2022, the Omicron variant took over as the main variant. Several scientific studies prove that Omicron causes less severe symptoms, fewer hospitalizations, and fewer deaths than the Delta variant.

For example, an August 2022 NIH retrospective cohort study[2] compared the risk of death posed by Omicron and Delta. *See* Isobel Ward, *et al.*, *Risk of covid-19 related deaths for SARS-CoV-2 omicron (B.1.1.529) compared with delta*

---

[2] A retrospective cohort study is a research study in which the medical records of groups of individuals who are alike in many ways but differ by a certain characteristic (for example, female nurses who smoke and those who do not smoke) are compared for a particular outcome (such as lung cancer).

*(B.1.617.2):retrospective cohort study*, BMJ Clinical Research ed., Vol. 378, https://pubmed.ncbi.nlm.nih.gov/35918098/) (last visited November 30, 2023). That study, which examined over 1 million COVID infections, concluded that "infections occurring at a time when the Omicron variant was rapidly spreading were associated with *significantly less severe outcomes* than first-time infections when the Delta variant predominated." *Id.* It also found that "the risk of covid-19 death was 66% lower (95% confidence interval 54% to 75%) for omicron BA.1 compared with delta after adjusting for a wide range of potential confounders." *Id*.

Another NIH study compared risks of emergency department visits, hospitalization, intensive care unit admission, and mechanical ventilation in patients who were "first infected during a time period when the Omicron variant was emerging to those in patients who were first infected when the Delta variant was predominant." Lindsey Wang, *et al.*, *Comparison of outcomes from COVID infection in pediatric and adult patients before and after the emergence of Omicron*, Preprint Server for Health Sciences., Vol. 37, https://pubmed.ncbi.nlm.nih.gov/35018384/) (last visited November 30, 2023). The results showed that the "risks in the Emergent Omicron cohort outcomes were consistently less than half those in the Delta cohort," as the chart below shows:

| Outcome | Emergent Omicron cohort (n=14,040) | Delta cohort (n=14,040) |
|---|---|---|
| ED visit | 4.55% (639) | 15.22% (2,137) |
| Hospitalization | 1.75% (246) | 3.95% (554) |
| ICU admission | 0.26% (36) | 0.78% (109) |
| Mechanical ventilation | 0.07% (10) | 0.43% (61) |

*Id.*

### 3.    Research challenges the effectiveness of mask mandates.

The Students' case has always depended on the assumption that mask mandates are the most effective way to reduce COVID transmission in schools. Research published since this case began, however, disputes that assumption and shows that facial coverings offer little protection from COVID in schools and other community settings. For example, a 2023 multi-cluster randomized control study by Cochrane, considered worldwide to be the gold standard for meta-analytic reviews, compared the efficacy of medical and surgical masks to that of no masks in preventing the spread of viral respiratory illness. Tom Jefferson, *et al.*, *Physical interventions to interrupt the spread of respiratory viruses*, Cochrane Database of Systematic Reviews 2023, Issue 1 (last visited November 30, 2023), https://www.cochranelibrary.com/cdsr/doi/10.1002/14651858.CD006207.pub6/full ). That study concluded that "wearing masks in [community settings] probably

makes little or no difference to the outcome of influenza-like illness (ILI)/COVID-19 like illness compared to not wearing masks." *Id*. That study undermines the core premise of the Students' claims: that forcing masks on large groups of people meaningfully reduces COVID infections within that population.

The Cochrane study is not alone in that finding. In September 2022, the National Institute of Health published a study dispelling the link between mask mandates and lower pediatric COVID-19 cases. Ambarish Chandra, Ph.D., Tracy Hoeg, Ph.D., *Lack of correlation between school mask mandates and pediatric COVID-19 cases in a large cohort*, The Journal of Infection Vol. 85, www.ncbi.nlm.nih.gov/pmc/articles/PMC9539411/#bib0003, (last visited November 30, 2023). The study challenged the data used by the CDC to support its prior masking recommendations:

> [The] study released by the U.S. Centers for Disease Control (CDC) from Arizona found that mask requirements were associated with a reduction in COVID-19 outbreaks whilst another multi-district U.S. study reported lower in-school transmission associated with universal masking. It has, however, been difficult to rule out the possibility that these associations were a result of confounding variables rather than an effect of the masks themselves.

*Id.*

These studies align with the expert opinion presented by CCSD in response to the Students' first motion for preliminary injunction. Dr. Jay Bhattacharya, M.D, Ph.D., and Professor of Health Policy at Stanford University School of Medicine,

had published six peer-reviewed publications on COVID at the time of his declaration. [Doc. 75-3 ¶¶ 3, 6.] Dr. Bhattacharya's research concluded "there are no high quality randomized evaluations that establish that masks on children are particularly effective in slowing disease spread." [*Id.*, Ex. 4-B at 3.] Rather, "[t]he highest quality observational evidence from the U.S. suggests no correlation between mandating that children wear masks and disease outcomes." [*Id.*]

### 4.    Governments have lifted their states of emergency.

COVID states of emergency have ended at every level of government. Georgia rescinded its state of emergency on July 1, 2021. *See* Gov. Brian Kemp Office of the Governor, *Gov. Kemp Issues Final Public Health State of Emergency Order*, gov.georgia.gov/press-releases/2021-06-22/gov-kemp-issues-final-public-health-state-emergency-executive-orderGovernor (last visited March 9, 2023). On April 10, 2023, the Biden administration signed a bipartisan congressional resolution ending the national emergency. ASSOCIATED PRESS, *Biden ends COVID national emergency after Congress acts*, https://www.npr.org/2023/04/11/1169191865/biden-ends-covid-national-emergency#:~:text=Biden%20ends%20COVID%20national%20emergency%20after%20Congress%20acts%20The%20U.S.,a%20close%20after%20three%20years (last visited November 29, 2023). When the district court denied the Students' amended motion, the White House had announced its intention to do so.

Cobb County also ended its state of emergency. In fact, the Cobb County Board of Commissioners' state of emergency the Students cite to in their Complaint [Doc. 1 ¶ 34] ended in March 2022. Cobb County Government, Communications, *Chairwoman Cupid ends COVID Declaration of Emergency early*, www.cobbcounty.org/communications/news/chairwoman-cupid-ends-covid-declaration-emergency-early (last visited November 30, 2023).

### 5.    Georgia law now prohibits mask mandates in schools.

More than a year ago, the Georgia legislature enacted the "Unmask Georgia Students Act," now codified at O.C.G.A. §§ 20-2-59, 20-2-779.2, 20-2-2077, and 20-2-2094. Together, those statutes prohibit school systems from requiring students and employees to wear a face mask without an opt-out choice. *Id*. The law effectively prohibits schools from implementing mask mandates. The Students have not challenged these laws.

### B. CCSD's efforts to fight COVID in schools.

### 1.    CCSD complies with current CDC and DPH guidelines for COVID-19 in schools.

When the district court considered the Students' amended motion for preliminary injunction, the most current version of the CDC Guidance[3] suggested

_____

[3] The CDC has published and repeatedly revised its Operational Guidance for K-12 Schools and Early Care and Education Programs to Support Safe In-Person Learning ("CDC Guidance"). When the Students filed their amended motion, the CDC Guidance had last updated its guidelines on October 25, 2022. Those guidelines underscored layering multiple prevention strategies, which CCSD has

several prevention strategies schools *may* adopt for a multi-layered approach to COVID-19. [Doc. 75-2 ¶¶ 12, 29.] These suggestions included promoting equitable access to vaccines, guiding students and staff to stay home when sick and get tested, cleaning surfaces daily, and implementing screening testing for high-risk activities when community levels are high. [*Id*. ¶ 30.] Though these guidelines are optional, CCSD complies with all of them. [*Id*. ¶ 31.]

And CCSD went well beyond those measures to keep its students safe. It implemented strict disinfection procedures, including a fogging and disinfecting system that is activated within the school or facility when a positive case is reported. [*Id*. ¶ 16.] CCSD schools followed enhanced daily cleaning procedures of offices, restrooms, breakrooms, café areas, classrooms, gyms, and other facilities. [*Id.* ¶ 17.] Custodial staff used specialized machines to disinfect restrooms. [*Id.*] After each class leaves the café area, all tables and chairs were wiped down and disinfected before the next class arrives. [*Id.*] Custodial staff vacuumed all carpet areas with HEPA filtration vacuums, including under student desks. [*Id.*]  Hand-sanitizing stations were installed on buses, throughout schools, and in other facilities. [*Id.* ¶ 20.] Students and staff were urged to wash their hands often. [*Id.*]

---

done since the pandemic started. *See* CDC Guidance, available at www.cdc.gov/coronavirus/2019-ncov/community/schools-childcare/k-12-childcare-guidance.html.

And CCSD instructed staff, students, and families to stay home if they experienced typical COVID symptoms. [*Id.* ¶ 21.]

CCSD also maintained contact with CDPH and GDPH, reported confirmed or suspected cases per the reporting protocol, and followed CDPH and GDPH guidance and protocols for sick students and staff. [*Id.* ¶ 23.]

CCSD also optimized ventilation in schools to limit transmission of illness. It regularly replaced over 27,000 air filters in its building and used specialized ionization devices to clean air in ventilation systems. [*Id.* ¶ 26.] CCSD's improvements in air quality meet the Environmental Protection Agency's Clean Air in Buildings Challenge, which provides basic principles and general actions recommended to improve indoor air quality in buildings and reduce the risk of airborne spread of viruses and other contaminants. [*Id.*]

### 2.    CCSD offered robust, effective virtual-learning options.

CCSD provided students with multiple virtual-learning options at the elementary, middle, and high-school levels. [Doc. 75-4 ¶¶ 6, 7-15.] As of March 2023, over 1,000 CCSD students were participating in one or more of CCSD's virtual offerings. [*Id.* ¶ 16.] While these programs were open all students, 77% of the enrollees were non-disabled, and only a fraction of CCSD's special-needs population used the online services. [*Id.*] The classes were led by highly qualified teachers specifically trained in the delivery of online courses. [*Id.* ¶ 17.] And the

online services provided robust, real-time interactions between peers and teachers, including through email, phone, text, and live video [*Id.* ¶¶ 19-21.]

### 3.    CCSD's stance on compulsory masking.

After requiring masks during the first year of the COVID-19 pandemic, CCSD adopted a mask-optional policy for students and employees in June 2021. [Doc. 75-1 ¶ 4.] CCSD made this change based on data from GDPH, which suggested that its prior mask mandate resulted in no meaningful reduction in COVID infections in CCSD schools. [Doc. 75-2 ¶ 7.] That data also showed that Cobb County's infection rate without a CCSD mask mandate was similar to counties whose local school districts mandated masks during the same time, and that CCSD incidence rates with a mask optional policy for 2021-2022 were similar to the prior year when CCSD had a mask mandate. [*Id.* ¶¶ 40-43.]

Although CCSD does not require masking, students and employees may wear them if they wish to do so. [Doc. 75-2 ¶ 18.] CCSD also made masks available to students and visitors who do not have one. [*Id.*]

### C. Status of the Students.

### 1.    C.S. and A.Z. have withdrawn from CCSD.

C.S. and A.Z. withdrew from CCSD at the end of the 2021-2022 school year and have since enrolled in other schools. [Doc. 75-1 ¶¶ 7, 10.] Neither student has shown an intent to return to CCSD. [*Id.* ¶¶ 8, 11.]

### 2. After returning to face-to-face learning, L.E. chose home-based instruction for non-COVID-related reasons.

L.E. began the 2022-2023 school year by attending school in person. [Doc. 75-1 ¶ 27.] Before the start of the school year, his IEP team met and agreed upon many health and safety measures to accommodate his concern about contracting an illness at school, including:

- L.E. may wear a face mask and gloves as needed;

- L.E. may sit away from any student coughing, sneezing, or engaging in poor hygiene, such as touching his or her face or nose often;

- L.E. will not use communal supplies or shared equipment;

- Staff will wipe down classroom surfaces with disinfectant before L.E. arrives;

- L.E. will transition between class before and after other students transition to avoid congested hallways;

- L.E. will use a designated, less-trafficked bathroom; and

- L.E. may eat lunch in an alternate location to minimize close contact with other students while eating.

[*Id.* ¶ 27.]

During the 2021-2022 school year, when he was not attending school in person, L.E. contracted COVID. [Doc. 74-16 ¶ 14.] After returning to face-to-face

instruction, between August and December 2022, he had many absences, as he had in every prior school year, including long before COVID. [*Id*. ¶ 28.] During the 2022-2023 school year, L.E. applied for "hospital homebound" ("HHB")[4] placement due to his absences. [*Id*. ¶ 29.] CCSD approved his application, and he began HHB on January 5, 2023. [*Id*. ¶ 30.] L.E. passed all his courses and progressed in all of his IEP goals and objectives. [*Id*.] L.E. could access CCSD's virtual-learning services but declined to use them. [*Id*. ¶ 32.] L.E. could have returned to in-person learning whenever he wanted.

### 3.    B.B. returned to face-to-face learning.

B.B. returned to face-to-face instruction in August 2022. [Doc. 75-1 ¶ 47.] Since then, he attended more than 70% of the 129 school days. [*Id*.] He also received 14 days of HHB services. [*Id*.] When the Students' again moved for a preliminary injunction, B.B. was earning all A's and progressing toward his IEP goals and objectives. [*Id*. ¶ 48.]

---

[4] HHB is an academic service designed to provide continuity between the classroom and home or hospital for students whose medical needs, either physical or psychiatric, do not allow them to attend school for a period of time. Ga. Dept. of Ed., Hospital/Homebound Services Program Overview, www.gadoe.org/Curriculum-Instruction-and-Assessment/CTAE/Pages/Hospital-Homebound-Services.aspx, (last visited November 30, 2023). Georgia's HHB regulations providing for educational programming outside the regular school building have been in place for decades. *See* Ga. Comp. R. & Regs. 160-4-2-.31.

In B.B.'s May 2022 and November 2022 IEPs, CCSD has also provided several health-and-safety-related accommodations to address B.B.'s fear of contracting an illness at school, including:

- B.B. could transition between classes before and after other students to avoid congested hallways;

- He could wear a face mask;

- Students and staff members were reminded to exercise proper hygiene, including washing hands;

- Though not required to do so, B.B.'s one-on-one paraprofessional agreed to voluntarily wear a mask at school; and

- B.B.'s school promised to notify B.B.'s parents about any known communicable diseases in his classroom.

[*Id.* ¶ 49.]

B.B. alleges he contracted COVID in October 2022. [Doc. 74-5 ¶ 15.] But the Students have no evidence pinpointing where he contracted the virus, including whether he caught it at school. Nor have they presented evidence that he missed 30% of school days in the 2022-2023 school year because of COVID infection (rather than non-COVID-related reasons). And despite B.B.'s medical needs, the Students have presented no evidence that B.B. experienced a severe case of COVID or an overall decline in health as a result of the infection. [*See id.*]

On top of that, B.B.'s parents had not explicitly asked for a mask mandate as an accommodation since August 2021—months before this lawsuit was filed. [Doc. 75-1 ¶ 50.] B.B. used no virtual-learning services during the 2022-2023 school year even though he was eligible to use them. [*Id*. ¶ 51.]

### 4.    The Students have been vaccinated.

During the hearing on the original motion for preliminary injunction, the Students' confirmed they all had been vaccinated against COVID-19. [Doc. 63 at 10:4-13.] As the CDC recognizes, vaccines have been highly effective in preventing severe COVID infections, hospitalization, and death. CENTERS FOR DISEASE CONTROL AND PREVENTION, *5 Things You Should Know about COVID-19 Vaccines*,    https://www.cdc.gov/respiratory-viruses/whats-new/5-things-you-should-know.html (last visited November 29, 2023). Thus, though the Students claim to need a preliminary injunction to avoid COVID exposure, their vaccinations have lowered the health risks of potential COVID exposure, on top of all the accommodations and COVID-mitigation measures CCSD already provides.

### <u>STANDARD OF REVIEW</u>

A preliminary injunction is an "extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 24 (2008). This Court reviews a district court's denial of a preliminary injunction for abuse of discretion. *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1317 (11th Cir. 2019). The

district court's underlying legal conclusions are reviewed de novo and its findings of fact for clear error. *Id*. "This deferential standard follows from '[t]he expedited nature of preliminary injunction proceedings, in which 'judgments…about the viability of a plaintiff's claims and the balancing of equities and the public interest…are the district court's to make.'" *BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Servs., LLC*, 425 F.3d 964, 968 (11th Cir. 2005). "For a factual finding to be clearly erroneous, this court, after reviewing all of the evidence, must be left with the definite and firm conviction that a mistake has been committed." *Bryant v. Rich*, 530 F.3d 1368, 1377 (11th Cir. 2008).

Separate from the preliminary injunction standard, the standard of review for the standing issues raised in this appeal is de novo. *Dream Defs. v. Governor of the State of Fla.*, 57 F.4th 879, 886 (11th Cir. 2023). Standing is a "necessary component of our jurisdiction to hear 'cases' and 'controversies' under Article III of the Constitution" and must be addressed as a threshold question. *Am. C.L. Union of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1190 (11th Cir. 2009).

## <u>SUMMARY OF THE ARGUMENT</u>

The district court committed no error in denying the Students' motion for preliminary injunction. To begin, the Students' motion suffers from two critical standing problems. First, having withdrawn from CCSD and enrolled in new schools, C.S. and A.Z. do not face a concrete, imminent threat of injury due to

CCSD's policies. Second, the Students' perceived threat of contracting COVID-19 at school due to the lack of masking is far too speculative to meet the injury-in-fact requirement for constitutional standing. Setting aside the standing issues, the district court properly found that the Students are unlikely to succeed on the merits of their failure-to-accommodate claims because they could not show that compulsory masking was necessary to afford them an equal opportunity to access in-person education.

## ARGUMENT AND CITATION OF AUTHORITY

I. **C.S. and A.Z. lack standing to seek injunctive relief.[5]**

A. **Standing to seek an injunction requires a concrete threat of imminent injury.**

Article III of the U.S. Constitution limits federal courts' subject-matter jurisdiction to "cases" and "controversies." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021). This "case or controversy" requirement requires that a plaintiff have standing to bring a claim in federal court. U.S. Const. art. III, § 2, cl. 1; *Warth v. Seldin*, 422 U.S. 490, 498–99 (1975).

Standing has three elements: (1) the plaintiff must have suffered an injury in fact; (2) the defendant must have caused that injury; and (3) a favorable decision

---

[5] At the district court level, CCSD did not argue that C.S.'s and A.Z.'s withdrawal from CCSD stripped them of standing to assert a claim for compensatory damages. [*See* Doc. 75.] Without conceding that they meet all the standing elements, CCSD does not oppose C.S. and A.Z.'s appeal on that limited issue.

must be likely to redress the injury. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). As the party invoking federal jurisdiction, the plaintiff has the burden of establishing standing "with the manner and degree of evidence required at" each stage of the litigation and for each form of relief sought. *Ramirez*, 141 S. Ct. at 2207-08; *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006)) (quotation marks omitted). A.Z.'s and C.S.'s lack of standing turns on the injury-in-fact element.

When the relief sought is an injunction, the plaintiff "must show a sufficient likelihood that he will be affected by the allegedly unlawful conduct in the future." *Wooden v. Bd. of Regents of Univ. Sys. of Ga.,* 247 F.3d 1262, 1284 (11th Cir. 2001). The future injury must be "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Lujan,* 504 U.S. at 560. This imminency requirement is met only when the plaintiff can show he or she will be injured within a "fixed period of time in the future." *Am. C.L. Union of Fla., Inc.*, 557 F.3d at 1194; *see also Lujan,* 504 U.S. at 564 ("[the plaintiffs'] 'some day' intentions—without any description of concrete plans, or indeed even any specification of when the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require.").

The key question, then, is whether A.Z. and C.S.—who no longer attend CCSD, have enrolled at new schools, and have no plan to come back—have shown

that CCSD's policy on compulsory masking will injure them at a fixed time in the future. As the district court correctly found, they cannot make that showing.

### B. After withdrawing from CCSD, A.Z. and C.S. face no imminent threat of future injury.

When a student withdraws from a school district or university and has no present intent to return, the student no longer faces an imminent threat from his former institution's policies and thus forfeits standing to enjoin them. For instance, in *Williams v. Board of Regents of University System of Georgia*, a female student sued her university under federal and state law after she was sexually assaulted on campus. 477 F.3d 1282, 1290-91 (11th Cir. 2007). Among other relief, she sought an injunction compelling the university to implement better sexual-misconduct policies and procedures. *Id.* at 1290. The district court dismissed her claim for injunctive relief for lack of standing, and the student appealed. *Id.* at 1290-91.

This Court affirmed the district court's ruling for two reasons. *Id.* at 1303. First, the student's assailants no longer attended the university. *Id.* Second, and more relevant to this appeal, the student had left the university whose policies she sought to enjoin. *Id.* Even though the student claimed she might return if the university implemented more protective policies, this Court still found that her "claim that an equal and more protective sexual harassment policy would prevent future harm is too conjectural to warrant injunctive relief." *Id.*

-24-

This Court reached a similar result in *Kocsis v. Florida State University Board of Trustees*, 788 F. App'x 680 (11th Cir. 2019). There, a graduate student complained internally that one of her professors made inappropriate comments to women and minority students in class. *Id.* at 682. She then left the university and sought an injunction requiring the university to suspend the professor pending a thorough investigation into his alleged misconduct. *Id.* at 683. As it did in *Williams*, this Court held that the student lacked standing for the injunction she sought. *Id.* at 685, n. 3. Because the student left the university and had no plan to return, she was "not actually and imminently under threat of suffering injury," and the injunction would not affect her. *Id.* This Court declined to grant an injunction that would only benefit third parties. *Id.*

Other jurisdictions have echoed the analysis in *Williams* and *Kocsis*. For example, the Seventh Circuit held that a student who had withdrawn from his high school lacked standing to bring a vagueness challenge against a school district policy banning "gang-like activity." *Fuller ex rel. Fuller v. Decatur Pub. Sch. Bd. of Educ. Sch. Dist. 61*, 251 F.3d 662, 665 (7th Cir. 2001). In *Harris v. University of Massachusetts Lowell*, the First Circuit found that two students—one who had unenrolled from the university and the other who had graduated—did not have standing to seek an injunction against their former university's vaccination policies. 43 F.4th 187, 192 (1st Cir. 2022). And in *Mumid v. Abraham Lincoln*

*High School*, the Eighth Circuit concluded that students who had graduated or aged out of their public school system had no standing to seek injunctive relief affecting the operation of their former high school. 618 F.3d 789, 797 (8th Cir. 2010).

Those authorities establish that C.S. and A.Z. lack standing to seek an injunction against CCSD. Like the students in *Williams* and *Kocsis*, C.S. and A.Z. left CCSD long ago—months before the Students even filed their amended motion for preliminary injunction. [Doc. 75-1 ¶¶ 7, 10.] Having withdrawn from CCSD, C.S. and A.Z. face no actual, imminent threat as a result of CCSD's masking policy. They also have no plan to return to CCSD. [*Id.* ¶¶ 8, 11.] On the contrary, both of their parents signed declarations suggesting C.S. and A.Z. intend to stay put at their new schools. C.S.'s mother testified that he is "comfortable at his new school" and that "we will not be going back to CCSD." [Doc. 74-10  ¶¶ 24-25.] A.Z.'s mother also said that "keeping [A.Z.] in her current school is the best option for her." [Doc. 74-2 ¶ 25.] In short, the record contains no evidence suggesting C.S.'s or A.Z.'s impending reenrollment at CCSD. And their hypothetical return if CCSD were to change its masking policy is too conjectural to support standing to ask the court to preliminarily enjoin CCSD's policies in the meantime. *See Williams,* 477 F.3d at 1303.

The changes in C.S. and A.Z.'s circumstances and their parents' testimony have extinguished any possibility that CCSD's masking policies might injure C.S.

or A.Z. within a "fixed period of time in the future." *Am. C.L. Union of Fla., Inc.*, 557 F.3d at 1194. And much like the students in *Williams* and *Kocsis*, C.S. and A.Z. will gain no redress from an injunction affecting only students currently enrolled in CCSD. In sum, because they are now unharmed by CCSD's policies and unable to show an injunction would benefit them, C.S. and A.Z. do not have Article III standing to seek preliminary injunctive relief. The district court's ruling on this issue, therefore, should be upheld.

### C. The outdated allegations in the Students' Complaint do not create standing to seek a preliminary injunction.

In their opening brief, the Students ask this Court to ignore that A.Z. and C.S. left CCSD in 2022 and have no plan to return. In the Students' view, it does not matter what has happened to A.Z. and C.S. in the years since they first sued CCSD, because "A.Z. and C.S. alleged facts sufficient for standing when they filed their Complaint," at which time they were still CCSD students subject to CCSD's policies. (App. Br. at 33.) In other words, the Students ask this Court to base its standing analysis solely on the allegations in the pleadings, even though some of their key factual allegations are undeniably false.

The Students' reliance on the inaccurate allegations in their original pleading ignores three well-settled standing principles. First, past harm does not confer standing to seek forward-looking injunctive relief unless there is an ongoing injury or a concrete threat that the injury will recur. *See City of Los Angeles v. Lyons*, 461

U.S. 95, 111 (1983). For that reason, any injury that C.S. and A.Z. claim they suffered before they withdrew from CCSD does not, by itself, create standing to seek prospective relief.

Second, the Students must show standing just as any other matter on which they bear the burden of proof, "i.e., with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561. The Students' evidentiary burden to establish standing to seek a preliminary injunction thus corresponds with their evidentiary burden to satisfy the substantive preliminary injunction factors under Rule 65. From that principle it follows that the Students may not rest on the allegations in their complaint to establish standing for a preliminary injunction. *See City of Miami Gardens v. Wells Fargo & Co.*, 956 F.3d 1319, 1321 (11th Cir. 2020) ("But, as the Supreme Court has made clear, mere *allegations* are insufficient as the litigation progresses.") (emphasis in original); *Cacchillo v. Insmed, Inc.,* 638 F.3d 401, 404 (2d Cir. 2011) ("When a preliminary injunction is sought, a plaintiff's burden to demonstrate standing 'will normally be no less than that required on a motion for summary judgment.'") (quoting *Lujan v. Nat'l Wildlife Fed'n (Lujan I)*, 497 U.S. 871, 907 n. 8 (1990); *accord Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 377 (D.C. Cir. 2017). To establish standing, C.S. and A.Z. instead had to present *evidence* that they face an actual or imminent injury

attributable to CCSD's policies. *See id.* at 560. For the reasons outlined above, they cannot make that showing.

Third, the Students are wrong in asserting courts are always confined to the allegations in the complaint when assessing a plaintiff's standing to seek a preliminary injunction. Standing is a "legal determination based on the facts established by the record." *Church of Scientology Flag Serv. Org., Inc. v. City of Clearwater*, 777 F.2d 598, 607 (11th Cir. 1985). When the record contains facts beyond the complaint's four corners, the court may consider those facts and treat the complaint "as having been amended to conform to the evidence." *Cone Corp. v. Fla. Dep't of Transp.*, 921 F.2d 1190, 1206 n. 50 (11th Cir. 1991). The district court thus committed no error in considering the uncontested fact of A.Z.'s and C.S.'s withdrawals from CCSD when evaluating their standing.

The Students cite no authority showing a mere sufficiency-of-the-pleadings standard applies when deciding standing to seek a preliminary injunction. Nor do they cite a single case involving a claim for preliminary injunctive relief. Beyond that, this Court concluded in *Church v. City of Huntsville*, 30 F.3d 1332, 1336 (11th Cir. 1994), that the pleading standing governs the standing analysis on a motion for preliminary injunction only when the plaintiff does not know standing is contested and has little opportunity to prepare to address that issue. That is not the case here, as the undersigned and the district court judge notified the Students

about C.S. and A.Z.'s standing problem well before they filed their amended motion for preliminary injunction. [Docs. 74-3 at 5-7; 82 at 6.]

Finally, even if C.S. and A.Z.'s standing depended only on the allegations in the pleadings, the district court was still right to conclude it lacked jurisdiction to issue a preliminary injunction. Because an injunction changing CCSD's masking policies would not meaningfully benefit C.S. or A.Z.,  their requests for injunctive relief are moot. *See Al Najjar v. Ashcroft,* 273 F.3d 1330, 1336 (11th Cir. 2001) ("If events that occur subsequent to the filing of a lawsuit or an appeal deprive the court of the ability to give the plaintiff or appellant meaningful relief, then the case is moot and must be dismissed."). In addition, for the reasons explained in the next section, all four Students lacked standing for injunctive relief even when they filed their Complaint because their alleged injuries are too speculative.

## II.   **The Students' fear of contracting severe illness is not an injury-in-fact for standing purposes.**

The Students' fears of catching COVID-19 are too speculative to confer constitutional standing to seek a preliminary injunction that would upend the status quo two years into the litigation.[6] To show a cognizable injury-in-fact to support a

---

[6] Though CCSD made this argument below [Doc. 75 at 22-25], the district court did not address it in its order denying preliminary injunctive relief. [*See generally* Doc. 82.] Still, this Court can and should address the argument on appeal. Standing goes to the district court's subject-matter jurisdiction. *Ramirez,* 141 S. Ct. at 2203.

request for injunctive relief, "the threatened future injury must pose a realistic danger and cannot be merely hypothetical or conjectural." *Fla. St. Conf. of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1161 (11th Cir. 2008). Plaintiffs cannot meet that bar by alleging they will suffer an injury at some point; the injury instead must be "*certainly* impending." *Lujan*, 504 U.S. at 564. A threat of future injury is too uncertain if its occurrence depends on a "highly attenuated chain of possibilities." *Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 409 (2013). As a corollary, a plaintiff cannot "manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly pending." *Id.* at 416.

For instance, in *Clapper v. Amnesty International USA*, the Supreme Court held that a group of attorneys, advocacy organizations, and media organizations lacked standing to seek an injunction of a provision of the Foreign Intelligence Surveillance Act ("FISA") that allowed surveillance of non-U.S. persons. *Id.* at 401. The plaintiffs had taken costly and burdensome measures to protect the confidentiality of their international communications, including travelling abroad to meet in person rather than communicating electronically or by phone, because they believed that some people they routinely communicated with were likely

---

And because subject-matter jurisdiction cannot be waived, a party can even raise it for the first time on appeal. *Scarfo v. Ginsberg*, 175 F.3d 957, 960 (11th Cir. 1999).

targets of FISA surveillance. *Id.* at 406-07. Though the Supreme Court recognized that the government might intercept some of the plaintiffs' communications, it held that such alleged injury was still too speculative to confer standing. *Id.* at 411. By extension, the plaintiffs could not establish standing simply be incurring financial injury to avoid that hypothetical future injury. *Id.* at 416.

In *E.T. v. Paxton*, the Fifth Circuit applied these principles in the COVID-19 context, holding the plaintiffs lacked standing to pursue claims much like the Students' claims here. 41 F.4th 709, 722 (5th Cir. 2022). There, a group of parents of students with disabilities sought to enjoin a state statute that prohibited mask mandates in schools, claiming the policy interfered with their access to in-person instruction by exposing them to a heightened risk of contracting COVID. *Id.* at 715. Like the Students here, the parents claimed their students' medical conditions made it "too dangerous" for them to risk attending school in-person without a mask mandate. *Id.* at 715.

The Fifth Circuit held this alleged threat was too speculative to support standing. It explained, "In light of widely available vaccines and the schools' other mitigation efforts, the odds of any particular plaintiff contracting COVID-19 and subsequently suffering complications are speculative, and the time (if ever) when any such infection would occur is entirely uncertain." *Id.* In other words, when it

comes to preliminary injunctions, risk-aversion does not satisfy Article III's injury-in-fact requirement. *See id.* at 716.

In *R. K. by & through J. K. v. Lee*, the Sixth Circuit confronted a similar claim and reached the same result. 53 F.4th 995, 998-99 (6th Cir. 2022), *reh'g denied,* No. 22-5004, 2022 WL 18434486 (6th Cir. Dec. 28, 2022). There, a group of disabled students challenged a statutory prohibition on universal masking, claiming their vulnerability to COVID complications made it too unsafe to attend school in a mask-optional environment. *Id.* at 998. But, as here, those students could not show the perceived threat was "certainly impending," making it too speculative to support constitutional standing. *Id.* at 999.

*Clapper*, *Paxton*, and *R.K.* guide the analysis here. Like the students in *Paxton* and *R.K.*, the Students' worries about catching COVID are too conjectural to give standing. The Students claim enjoining CCSD's mask-optional policy is necessary to avoid catastrophic health complications that (i) *might* result (ii) *if* they were to catch COVID (iii) while at school (iv) as a result of non-universal masking. That "highly attenuated chain of possibilities" makes their perceived threat of injury too uncertain to satisfy Article III. *See Clapper*, 568 U.S. at 409.

As the Fifth Circuit noted in *Paxton*, more recent developments make that chain of possibilities even more tenuous—if not altogether unlikely. *See Paxton*, 41 F.4th at 715. COVID cases have generally declined. Newer strains are mild.

-33-

Widely available vaccines have slashed the risk of severe complications, hospitalization, and death. CCSD's COVID-mitigation protocols have further reduced the risk of transmission. Given those encouraging developments, the Students have no basis for claiming they face a "certainly impending" threat of severe, COVID-related complications because of the challenged policy.

And as *Clapper* shows, the Students cannot manufacture standing by voluntarily refraining from in-person schooling based on speculation alone. Like their non-disabled peers, the Students may return to in-person school whenever they choose. Their decision to avoid school amounts to self-imposed harm, not an injury-in-fact stemming from CCSD's mask-optional policy. As a result, they cannot show the requisite threat of future injury to satisfy Article III's standing requirements.

### III.   The Students cannot show a substantial likelihood of prevailing on their failure-to-accommodate claims.

To prevail on a disability discrimination claim, the plaintiff must prove "he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity" because of his disability. *Bircoll v. Miami-Dade Cnty.*, 480 F.3d 1072, 1082 (11th Cir. 2007). In some cases, the failure to reasonably accommodate a person's disability, such as by modifying policies and procedures, can be a form

of disability discrimination. *Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1262-63 (11th Cir. 2007).[7]

But a person with a disability is entitled only to a *reasonable* accommodation, not the accommodation of his choice. *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1286 (11th Cir. 1997). The public entity need not provide the person's preferred accommodation or the maximum accommodation possible. *Id.* at 1285. Nor need a defendant "eliminate all discomfort or difficulty" associated with a disability. *A.L. by and through D.L. v.Walt Disney Parks and Resorts U.S., Inc.*, 900 F.3d 1270, 1296 (11th Cir. 2018) ("*A.L. I*").

To prevail on a failure-to-accommodate claim, the plaintiff must prove four elements: (1) he has a disability; (2) "he requested a reasonable accommodation"; (3) "the requested accommodation was necessary to afford him an equal opportunity to use and enjoy" the program or service at issue; and (4) "the defendant refused to make the requested accommodation." *Schaw v. Habitat for Hum.. of Citrus Cnty., Inc.*, 938 F.3d 1259, 1264 (11th Cir. 2019) (cleaned up).

On the second element, the plaintiff has an initial burden of showing the proposed accommodaiton is "facially reasonable." *Id.* at 1265. If the plaintiff does

---

[7] When analyzing reasonable accommodation claims, courts look to caselaw under the ADA, Rehabilitation Act, and Fair Housing Act for guidance. *Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1220 (11th Cir. 2008).

so, the burden shifts to the defendant to show it would "impose an undue burden or result in a fundamental alteration of its program." *Id.* at 1266. If the defendant cannot carry that burden, then the plaintiff satisfies the second element of his claim. *Id.* at 1268-69.

This burden-shifting framework applies only to the second element of the claim. *Id.* at 1268-69. Thus, even if the plaintiff proves he requested a facially reasonable accommodation that did not unduly burden or fundamentally alter the defendant's programs, he still must prove the third element: that his requested accommodation was necessary to afford equal access to the program at issue. *Id.* at 1269.

That third element involves two critical concepts: necessity and equality. *Id.* "[A] 'necessary' accommodation is one that alleviates the effects of a disability." *Id.* But "it's not enough that accommodation be 'necessary' in the abstract. . . ." *Id.* at 1272. It must be necessary to provide the person with an "equal opportunity to" access the program at issue. *Id.*

### A. The need for a proposed accommodation depends heavily on the effectiveness of accommodations already in place.

"[D]etermining what is 'necessary' is inherently fact-intensive and largely depends on context." *A.L. I*, 900 F.3d at 1295. As this Court made clear in *A.L. by and through D.L. v. Walt Disney Parks and Resorts US, Inc.*, the defendant's

provision of alternative accommodations heavily informs that factual context. *See id.* at 1296-98.

In *A.L. I*, a group of parents claimed that Disney failed to accommodate their children's severe autism by modifying its policies to allow them to bypass wait times for rides. *Id.* at 1296-97. They presented affidavit evidence that their autism profoundly disrupted their perception of time, making them far more prone to disability-related "meltdowns" in a chaotic themepark environment. *Id.* In response, Disney argued that its existing program reasonably accommodated those disabilities by allowing the children to avoid physical lines, even if it did not negate wait times. *Id.* at 1297. Because there was a factual dispute on whether Disney's virtual-waiting policy (rather than cutting lines altogether) reasonably accommodated the "meltdown" concern when the children transitioned between rides, this Court held the district court erred in granting summary judgment to Disney and remanded the case for a bench trial to resolve the issue. *Id.* at 1297-98.

On remand, Disney won the bench trial. *A.L. by and through Walt Disney Parks and Resorts U.S., Inc.*, 50 F.4th 1097, 1106-07 (11th Cir. 2022) ("*A.L. II*"). The district court found the plaintiff's proposed policy modification (allowing plaintiffs to cut lines) was unnecessary to give them an equal opportunity to access the park rides because Disney's existing program already reasonably accommodated the plaintiffs' autism-related disabilities. *Id.* at 1106. Even "without

further modification," Disney's policies gave them "a 'like experience' to that of non-disabled guests." *Id.* On appeal, this Court affirmed the district court's verdict for Disney, reasoning that the district court's factual findings were not clearly erroneous. *Id.* at 1110.

Thus, as these two Disney cases show, if the defendant's policies already reasonably accommodate the plaintiff's disability, making the requested accommodation unnecessary, the plaintiff's failure-to-accommodate claim fails. *See Nadler v. Harvey*, No. 06-12692, 2007 WL 2404705, at *9 (11th Cir. Aug. 24, 2007) ("[I]n any event, we find Defendant's offered accommodation to be reasonable. Therefore, [the] . . . reasonable accommodation claim[] fail[s]."). After all, the plaintiff is entitled only to a reasonable accommodation—not his preferred accommodation. *Stewart*, 117 F.3d at 1286.

So too here. The district court essentially assumed the Students' proposed accommodation was reasonable [Doc. 82 at 12] but still found they failed to show that their proposed modification of CCSD policy (compulsory masking) was necessary to afford them equal access to an in-person education.

To begin, even without a mask mandate, CCSD's COVID-mitigation measures already give students, including L.E. and B.B., meaningful access. [*Id.* at 11-13.] CCSD implements robust health and safety measures that comply with CDC and GDOH guidelines. [*Id.* at 13-14 n.6.] All students have access to CCSD's

virtual school offerings. [*Id.* at 14.] Beyond those general measures, the Students' IEP teams have provided them a plethora of accommodations that address their disability-related needs. [*Id.* at 13.] The data show these preventatives have been highly effective in reducing COVID transmission in CCSD schools. [*Id.* at 15.]

Next, the Students could not prove the addition of a mask mandate would reduce the risk of COVID transmission further. CCSD presented strong, statistical evidence that mask mandates do not meaningfully reduce COVID transmission. [Doc. 75-3 ¶¶ 3, 6.] After all, COVID transmissions have consistently declined in CCSD schools, even after CCSD lifted its mask mandate. Though the Students might disagree with the district court's findings on that point, they show no error in how it weighed the evidence. [*See* Doc. 63 at 5:20-6:5.]

And during this litigation, the Students' personal experiences have been consistent with those larger data trends. L.E. and B.B. have made good grades and safely attended school in-person. B.B. has attended in-person school for more than 70% of possible school days and received all A's. [*Id.* at 14.] L.E. has also attended in-person schooling and made good grades. [*Id.*] Both have been vaccinated, slashing the risk of COVID infection and complications. [Doc. 63 at 10:4-13.]

After considering all this evidence, the district court correctly found that CCSD conducted "individualized inquiries" into what accommodations were

necessary to ensure meaningful access and that CCSD had reasonably accommodated the Students' disabilities. [Doc. 82 at 12-13.] On appeal, the Students challenge that finding on two erroneous grounds: (i) that the "individualized inquiry" required the district court to focus on whether their proposed policy modification would unduly burden or fundamentally alter CCSD's programs (*see* App. Br. at 42-44); and (ii) that, even though they have safely attended in-person school, they have still missed too much for CCSD's accommodations to be effective (*see id.* at 47-48). Both arguments are wrong.

### B. The Students' failure to prove the need for compulsory masking rendered the reasonableness of that request irrelevant.

Relying on caselaw from other jurisdictions, the Students erroneously argue that the ADA and Rehabilitation Act required the district court to go through the needlessly formalistic exercise of considering whether their proposed policy modification (mask mandates on demand) would unduly burden or fundamentally alter CCSD's programs and services. (*See* App. Br. at 42-44.) They are incorrect. No matter what other jurisdictions might do, this Court does not give dispositive weight to the "undue burden" or "fundamental alteration" analysis.

In *Schaw v. Habitat for Humanity Citrus County*, this Court made clear this burden-shifting analysis relates only to the "reasonableness" element. *Schaw*, 938 F.3d at 1269. Even if the requested policy modification is reasonable, it does not mean it is necessary to provide meaningful access. *Id.* And if the plaintiff cannot

show necessity, their accommodation claim fails, no matter how reasonable their proposed accommodation might be. *Id.*

So even after assuming the Students' proposed modification to be "facially reasonable," the district court did not need to continue analyzing the second element of their accommodation claim (reasonableness) when they could not satisfy the third (necessity). *See Schaw*, 938 F.3d at 1269. Like the trial judge in *A.L. II*, the district court properly concluded the Students already had meaningful access to an in-person education, based on the accommodations and policies already in place, coupled with the strong evidence that the challenged policy has not prevented the Students from accessing in-person education. [*See* Doc. 81 at 11-15.] It logically followed that it was unnecessary to compel teachers and students to continue wearing a mask, especially given COVID's current risk profile.

As the party trying to disrupt the status quo, the Students had the burden of showing a substantial likelihood of prevailing on the merits of their accommodation claim. *See Lujan*, 504 U.S. at 561. That burden required them to prove a mask mandate was necessary to afford them the same opportunity to access in-person education as their non-disabled peers. *See Schaw*, 938 F.3d at 1264. The Students instead only complained about not getting their accommodation of choice.

By focusing on the need for the Students' proposed modification, the district court applied the correct legal standard, and its conclusion finds ample support in

the evidentiary record. Because the Students are unlikely to satisfy the third element of their accommodation claim, the district court properly denied preliminary injunctive relief. *See Smith v. Comm'r, Ala. Dep't of Corr*., No. 21-13581, 2021 WL 4916001, at *4 (11th Cir. Oct. 21, 2021) (affirming district court finding that plaintiff could not show a substantial likelihood of prevailing on the merits of his failure-to-accommodate claim where he did not show a lack of meaningful access). In challenging the district court's rationale, the Students invoke an erroneous legal standard, conflating the "necessity" element with the "reasonableness" element.

### C. The Students' absences do not prove that CCSD's current accommodations are ineffective.

The district court correctly found CCSD's measures have "been effective, allowing the students to attend in-person school as often as their health allows." [Doc. 82 at 15.] When the Students have been healthy enough to attend school in-person, they have safely done so, even without compulsory masking. [*Id.* at 11-15.] After CCSD went to a mask-optional policy, if the Students missed school or chose home-based instruction, it was because of non-COVID-related illness—just like they did years before the world ever heard of COVID. [*See* Doc. 75-1 ¶¶ 28-30, 47.] That course of conduct betrays any suggestion that they are too scared for their health and safety to risk in-person attendance, "relegat[ing] [them] to [only] limited participation in an in-person education." (*See* App. Br. at 49 (emphasis

removed).) Their appellate brief might say one thing, but their actions say otherwise.

The district court had ample evidentiary support for its finding that CCSD's current accommodations and COVID-mitigation measures have been effective in providing the Students an equal opportunity to access in-person education. The Students have attended school in-person when they can, and, when they missed in-person schooling, it was not because of the challenged mask policy. The Students might disagree with the district court's factual findings, but they cannot show they were clearly erroneous.

## **CONCLUSION**

For all the reasons stated above, CCSD asks this Court to affirm the district court's denial of the Students' Amended Motion for Preliminary Injunction or Temporary Restraining Order.

Respectfully submitted this 1st day of December, 2023.

/s/ *Brandon O. Moulard*
Brandon O. Moulard
Georgia Bar No. 940450
Sherry H. Culves
Georgia Bar No. 319306
Jeffrey R. Daniel
Georgia Bar No. 949075
*Attorneys for Appellees*

PARKER POE ADAMS & BERNSTEIN LLP
1075 Peachtree Street, NE
Suite 1500
Atlanta, Georgia 30309
678.690.5750 (phone)
404.869.6972 (facsimile)
brandonmoulard@parkerpoe.com
sherryculves@parkerpoe.com
jeffdaniel@parkerpoe.com

## <u>CERTIFICATE OF TYPE-VOLUME COMPLIANCE</u>

Pursuant to Rule 32(a)(7)(B) of the Rules of the United States Court of Appeals for the Eleventh Circuit, the undersigned counsel for the Appellees certifies that this principal brief complies with the type-volume limitation of the rules concerning the number of words (13,000) in a brief. Appellees certify that the number of words in this Brief is 9,530, excluding the parts of the brief exempted by Rule 32(f)(7) and Eleventh Circuit Rule 32-4. Appellee certifies that the number of words in this Brief was calculated by the word processing program Microsoft Word.

Respectfully submitted this 1st day of December, 2023.

/s/ *Brandon O. Moulard*
Brandon O. Moulard

-45-

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this day I electronically filed the foregoing **APPELLEES'**

**RESPONSE BRIEF** using the Court's CM/ECF filing system, which will serve an

electronic copy of the same to these attorneys of record:

Michael J. Tafelski, Esq.
Eugene Choi, Esq.
Claire Sherburne, Esq.
Brock Boone, Esq. (pro hac vice pending)
Southern Poverty Law Center
P.O. Box 1287
Decatur, GA 30031-1287
michael.tafelski@splcenter.org
eugene.choi@splcenter.org
claire.sherburne@splcenter.org
brock.boone@splcenter.org

Allison B. Vrolijk, Esq.
Law Office of Allison B. Vrolijk
885 Woodstock Road,
Suite 430-318
Roswell, GA 30075
allison@vrolijklaw.com

Craig Goodmark, Esq.
Goodmark Law Firm
1425 Dutch Valley Place, Suite A
Atlanta, GA 30324
(404) 719-4848
cgoodmark@gmail.com

Respectfully submitted this 1st day of December, 2023.

/s/ *Brandon O. Moulard*
Brandon O. Moulard